UNITED STATES, Appellee

v.

Lawson H. GOBER, Missile Technician
First Class, U.S. Navy, Appellant.

No. 94–0040.
CMR No. 91 1225.

U.S. Court of Appeals for
the Armed Forces.

Argued Jan. 12, 1995.

Decided Sept. 27, 1995.

For Appellant: *Laura J. Beck* (pro hac vice) (argued); *Chuck R. Pardue* (on brief); *Lieutenant William M. Schrier,* JAGC, USNR.

For Appellee: *Lieutenant John R. Livingston, Jr.,* JAGC, USN (argued); *Colonel J. Composto,* USMC, *Commander S.A. Stallings,* JAGC, USN, *Major Laura L. Scudder,* USMC (on brief); *Colonel T.G. Hess,* USMC, and *Captain Laulie S. Powell,* USMC.

*Opinion of the Court*

WISS, Judge:

1. In a contested trial, general court-martial members convicted appellant of rape (3 specifications), sodomy with a child (3 specifications), and committing an indecent act upon a child, *see* Arts. 120, 125, and 134, Uniform Code of Military Justice, 10 USC §§ 920, 925, and 934, respectively. They sentenced appellant to a dishonorable discharge, confinement for 30 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved these results, and, with minor modifications of the rape specifications, the Court of Military Review [1] affirmed.

2. On appellant's petition, we granted review to consider issues asking whether the military judge erred by "refus[ing] to admit exculpatory evidence of prior sexual abuse by the children's natural father" and by refusing "to allow two defense witnesses to testify as to when they noted the children's behavior which would have indicated sexual abuse." Now, after further briefs and oral argument, and our study of the record of trial, we hold that neither of appellant's claims of error has merit.

## I

3. The charges of which appellant stands convicted emanated from an accusation of sexual assault first made by one of his two stepdaughters to the local civilian police on New Year's Eve of 1989. Over the next several months, proceedings in the civilian community withered on the vine. Thereafter, military authorities began an investigation into the matter, resulting in various allegations of sexual abuse occurring between April 14, 1987, and January 1, 1990. Final Brief at 2-3.

4. At the trial of these charges, both stepdaughters, then ages 8 and 13, testified in graphic detail concerning appellant's sexual abuse of them, and the fact of sexual abuse tended to be confirmed by medical testimony. On the other hand, the defense theorized that the girls' natural father, Mr. R, had sexually abused his daughters prior to 1985 and that the instant allegations against appellant simply were a transference to himself as a father figure who was a strict disciplinarian, triggered by "some unknown stressor." Answer to Final Brief at 1-3, 5. The issues before us purportedly relate to restrictions by the military judge on certain defense evidence proffered in pursuit of this theory. To understand the real nature of the trial dispute, certain background information is helpful.

5. Appellant and his wife Evelyn were married in November 1984, and appellant adopted his wife's two daughters, "C" and "K", in mid-1985. At the time appellant had first entered the lives of his future family in March 1983, they were experiencing trauma that included divorce and several instances of the girls' natural father kidnapping them during visitations and secreting them for months at a time without contact with their mother. Final Brief at 5 and 3.

6. Sometime during the fall of 1984, officials at C's school noticed certain " 'acting-out behavior' " in her—"lying, cheating, stealing, and misbehavior ... [that] had no profit. They weren't done with, like, malicious intent. They were done because the child seemed to lack some of the ability to control [her] desires with [her] impulses...." Consequently, the school referred C to counseling with Dr. Mackinem, a state-licensed professional who specializes in incest counseling and family therapy.

7. Dr. Mackinem first saw "C" and Evelyn on October 22, 1984; thereafter, over the course of 6 months, he saw them along with appellant and "K" on approximately 15 occasions. During the course of treating this family, Dr. Mackinem compiled a "family history" which he used "in forming a diagnosis and formulating" a plan of treatment. Asked by defense counsel during direct examination in front of the members to relate this family history, the following exchange occurred:

> It was bad. It was as bad as it gets and that is probably why I remembered it. [C] had memory at that time of being physical-

1. *See* 41 MJ 213, 229 n. * (1994).

ly abused by her father, a Mr. [R], who I never met. She also had memories of watching Mr. [R] beat Evelyn. She had memories of being kidnapped by Mr. [R] and taken to a location that was near a lake or pond and, essentially, being left on her own to take care of her sister, [K], and then two children of Mr. [R]'s live-in woman. She had fairly distinct memories of pretty major physical abuse of herself and her mother and then, in the course of consulting with Mrs. Gober, I was able to get a fuller picture of the violence and was, also, able to get a picture of some of Mr. [R]'s sexual habits.

Q. What was the history of Mr. [R] as related by Evelyn?

A. Again very violent—

TC: I would object to that as hearsay.

MJ: Sustained.

ACC [2]: Your Honor, we believe that this testimony—

MJ: Do you want a 39(a) session, counsel?

ACC: That will be appropriate, sir.

8. During the ensuing out-of-court session called under Article 39(a), UCMJ, 10 USC § 839(a), defense counsel urged that the testimony would not be hearsay at all. Rather, he explained that "*it is not being offered for the truth of the matter asserted,* merely, in that it was used in the assessment that the witness used in formulating his diagnosis or opinion as to the underlying causes of the problems with [C]." (Emphasis added.) *See* Mil.R.Evid. 801(c), Manual for Courts-Martial, United States, 1984 (" 'Hearsay' is a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.").

9. Apparently wary, the military judge questioned "the relevance" of Mr. R's allegedly abusive conduct to whether appellant had sexually molested his two stepdaughters. Defense counsel reiterated, substantially, that part of the basis of Dr. Mackinem's diagnosis was the family's history that was compiled during the counseling sessions and that, in turn, part of that history was Mr. R's

sexual behavior as reported to the doctor by the mother. Still skeptical concerning relevance of the testimony, the military judge granted defense counsel's request "to make a proffer for the record using the witness as to what his testimony would be."

10. During Dr. Mackinem's proffered testimony, he revealed in more detail the part of the family history concerning Mr. R that Evelyn had given him:

Part of it was just corroborating what [C] had already said about the domestic violence, but Mrs. Gober was able to give me a clearer picture of the sexual tendencies of Mr. [R] which, much like his violence, were very controlling. Sexually, he showed a very strong exhibitionist trait. She reported receiving letters from him from various tours of duty where he would re-account [sic] in elaborate detail his latest meetings with various ladies of the evening. He would write letters to various men's magazines, would force Evelyn into certain sexual behaviors and that was pretty much what she was able to tell me about his sexual activities.

11. Subsequently, counsel asked Dr. Mackinem whether, "based upon the family history as relayed by [C] and her mother, and based upon your observations as to [C's] acting-out behavior, [he had] reach[ed] a diagnostic conclusion and what was that conclusion or opinion?" The doctor responded: "Well, the diagnosis, which I didn't write at the time, would either be post-traumatic stress syndrome, which was the one I would favor or, potentially, it could have been an adjustment disorder with mixed emotions."

12. As follow up, counsel asked: "Would it be a fair statement to say that based upon the history and your examination of the acting-out behavior of [C] that that behavior was consistent with sexual abuse, but not specific to it?" The witness responded, "Right." Attempting to inch a bit farther, perhaps, counsel asked a little later: "Now, you stated that your opinion was a post-traumatic stress syndrome most probably

---

**2.** ACC refers to Assistant Civilian Counsel. It would have been better to use A.C.C. instead because ACC is generally used for the Accused. In this record ACCUSED is used.

caused by sexual abuse?" Sensing this extension of his actual testimony, however, Dr. Mackinem pulled back the reins, stating: "Caused by some major traumatic abuse."

13. On cross-examination regarding his proffered testimony, Dr. Mackinem was referred to a document that was marked as Appellate Exhibit XXII, a reporting letter from him to the Department of Social Services. At trial counsel's request, Dr. Mackinem read aloud the last sentence of the first paragraph of that letter as follows: "While I cannot document the fact, I have some suspicion that both [C] and [K] were sexually abused." Dr. Mackinem conceded that this was merely "speculation" based on the "history from Evelyn," but "[n]othing else."

14. Upon further questioning, this time by the military judge, Dr. Mackinem took pains to make specific distinction between physical abuse and sexual abuse that may have occurred in this family:

Q. . . . . Now, if I understand your testimony correctly, *you first obtained a history from Evelyn Gober?*

A. Yes.

Q. Wherein she related to you that [RR], [C]'s father and [K]'s father, had been abusive?

A. Yes.

Q. Did she relate to you—*did she tell you that he [Mr. R] had sexually abused either child?*

A. *No.*

Q. Just abused?

A. Right.

* * *

Q. *Okay, what did she [C] relate to you?*

A. *The physical abuse, the being beaten,* seeing her mother being beaten.

Q. Okay. And if I understand your testimony correctly, based on this information, you concluded that there was sexual abuse?

A. I concluded that there was a possibility that there was sexual abuse.

Q. Possibility?

A. I have never, ever stated that there was.

Q. Now, and the post-traumatic syndrome that you were referring to a moment ago, or acting-out behavior, manifested by [C] as a result of physical abuse by [RR]?

A. For certain, that.

* * *

Q. This was an acting-out behavior on her part as a result of physical abuse?

A. Right. It would be fair to say that I was sensitive to the fact that there may have been sexual abuse, and kept myself aware of it so that if something more specific appeared, I could deal with it directly.

(Emphasis added.)

15. At the conclusion of the military judge's questioning, defense counsel asked three additional questions of Dr. Mackinem concerning what he meant by being unable to "document" the sexual abuse. The doctor explained that he had looked for—but apparently had not seen—"some specific sign or manifestation from [C] that she experienced sexual abuse[,]" that is, "some kind of behavioral manifestation." Apparently intrigued, the military judge followed up:

Q. You're saying now . . . that you believe there to be sexual abuse by [RR]?

A. [Nodding negatively.]

Q. You're not saying that?

A. I'm not saying that. There are behaviors manifested that are specific to sexual abuse. Then there are behaviors manifested specific to any major childhood trauma.

Q. Okay. Now, what were these behaviors related to?

A. These were not specific sex abuse behaviors. These were behaviors that could be found with any major childhood trauma.

Q. So the syndrome you were referring to was any type of trauma, but not necessarily—not behavioral, acting-out behavior associated with sexual abuse?

A. Not specific, right.

16. At the conclusion of this proffer of testimony, the military judge still saw no relevance in Dr. Mackinem's testimony. He indicated that, if the doctor could have said

that C's accusations against appellant were a result of

> some sort of transferred dislike, hatred, contempt, whatever for Lawson Gober as a result of the abuse, albeit physical or sexual, that may or may not have been committed by her natural father, I might allow this testimony for the limited purpose of credibility of [C] Gober, but not from what I've heard.

17. After a short defense-requested recess, the military judge continued:

I think you understand, Mr. Savage, my consternation about the relevance of Mr. Mackinem's testimony, but there was one thing that he testified about, almost as an afterthought, pursuant to a question I asked, and that was typical behavior that would be manifested by a child that had been sexually abused involving pressing together of two dolls indicating sexual abuse. Do you recall that?

ACC [2]: [No audible response.]

MJ: He said—well, he first said [C] didn't manifest those kinds of symptoms, only physical abuse symptoms, and then went on to say a characteristic symptom of a sexually abused child would be pressing of the two dolls together. And then there was the testimony [earlier that morning] of Mrs. Patton that she actually saw [C] do that, but she saw [C] do that in 1989, some four years after Mr. Mackinem—or three years anyhow—had examined [C].

*If you would like to call Mr. Mackinem and ask him these questions about the symptoms that would normally be manifested by a child who had been sexually abused, and whether this would carry over for any period of time, and if he could say, yes, it would be a carry-over, then, of course, it becomes relevant,* but keep in mind that this acting-out behavior observed by Mrs. Patton was after the alleged sexual abuse by the accused, allowing the trier of fact to draw their own conclusions about when there was sexual abuse, if any.

* * *

CC: . . . Our collective recollection is that there was no evidence by [C] of any sexual abuse prior to September of 1989. That's what our dilemma is. The evidence of the Barbi dolls is in the spring of 1989 which is prior to [C]'s statement of sexual abuse and after the theory of abuse of [RR], so we are sort of in a Catch 22.

MJ: I understand and I'm not so certain that the child was that specific and, certainly, Mrs. Patton wasn't that specific either. She seemed to think that it occurred sometime, eight months, if I recall correctly, prior to the time that they left the area, which would have been, basically, the spring of 1989.

ACC: I don't know if the military judge is waiting for a response, but—

MJ: Yes, I am because I've told you—I think I've told you by inference that there is some relevance now, the relevance being the testimony of Mr. Mackinem about what would be characteristic of sexual abuse and what Mrs. Patton testified to this morning. That makes it relevant.

ACC: I understand that thus far the witness has testified that he did conduct therapy with the family, Evelyn Lawson and the children, and that he did take a history from [C] and he did take a history from the mother. So far, that has been the extent of the testimony in front of the members?

MJ: That's correct.

ACC: We are ready to proceed.

MJ: Do you want to call him as a witness and talk about—

ACC: We have other issues we can talk with him about.

MJ: Well, let's first resolve this one.

ACC: *No, we do not wish to pursue this line of questioning.*

MJ: Okay, so we are not going to talk about his conclusions after he had treated the family with regards to any sexual abuse?

ACC: That is correct, sir.

MJ: We are not going to talk about the acting-out behavior of [C] with regards to the physical abuse because I don't feel that

that would be relevant unless—and he told me it wasn't—there could be some transferred dislike or contempt or hate for the accused as a result of her natural father's physical abuse. I think that was clear.... (Emphasis added.)

## II

18. We have set forth fully the relevant portions of the record of trial, in almost painfully tedious detail, in order to make clear what issue(s) were litigated at trial, what theory or theories were advanced, and what testimony was proffered. In evaluating the merits of any alleged evidentiary missteps by the military judge, we search only for a clear abuse of the judge's discretion. *See United States v. Jenkins,* 27 MJ 209 (CMA 1988); *United States v. Mukes,* 18 MJ 358 (CMA 1984).

### A

19. Against this backdrop, appellant has framed the first granted issue as a complaint that the military judge "improperly refused to admit exculpatory evidence of prior sexual abuse by the children's natural father." Appellant, however, is obtuse as to exactly what is the supposedly "exculpatory evidence" in question.

20. For instance, early in his brief on this issue, appellant "contends that the military judge ... committed plain error by sustaining the Government's hearsay objection to potential testimony of Dr. Mitchell B. Mackinem, witness for the defense." Final Brief at 7. His theory seems to be that, in the course of relating the family history as reported to him by Evelyn, Dr. Mackinem would reveal Mr. R "as a possible sexual abuser of [C]." Final Brief at 10. Appellant argues in this Court that such testimony—that is, Dr. Mackinem's reiterating what Evelyn purportedly told him about the family history—simply was reiteration of "[s]tatements for purposes of medical diagnosis or treatment." *See* Mil.R.Evid. 803(4); *United States v. Clark,* 35 MJ 98 (CMA 1992); *United States v. Edens,* 31 MJ 267 (CMA 1990); *United States v. Deland,* 22 MJ 70(CMA), *cert. denied,* 479 U.S. 856, 107 S.Ct. 196, 93 L.Ed.2d 128 (1986). If so, then of course the testimony would satisfy an exception to the hearsay exclusionary rule, *see* Mil.R.Evid. 802, and thus would be substantively admissible on the question of guilt.

21. Another possible focus of appellant's ire, however, pops up in the penultimate sentence in his brief on this issue. There, counsel asserts: "Lawson Gober contends that Dr. Mackin[e]m should have been able to give his medical diagnostic opinion that [C] was suffering from post-traumatic stress syndrome (Tr. 378), and based on the family history, possibly suffered from sexual abuse prior to 1985." Final Brief at 11.

22. Thus, appellant's chafing could be the result of either or both of two allegedly wrongful denials of "exculpatory evidence": that Dr. Mackinem was not permitted to repeat family-history statements that would portray Mr. R as a sexual abuser of "C"; and that Dr. Mackinem was not permitted to give his medical diagnostic opinion that "C" suffered from post-traumatic stress syndrome and possibly suffered from sexual abuse.

23. The difficulty with both theories is the same: Just like a quilt may unravel when the wrong thread is pulled—and the more it is pulled, the more inevitable is the resultant shapeless pile of yarn—appellant's theories, too, unravel in light of the record of trial—and the more that one looks to the record for support, the more they unravel.

### *Family-history hearsay*

24. As to whether purported family-history statements of Evelyn to Dr. Mackinem would be "exculpatory evidence" admissible under the hearsay exception found in Mil.R.Evid. 803(4), the short answer is that no evidence ever was offered on that basis. This litigation began, it will be recalled, when defense counsel sought from Dr. Mackinem a recitation of "the history of Mr. [R] as related by Evelyn." ¶ 7. Counsel's expressed theory of admissibility was that this history formed part of the basis for an anticipated proffer of Dr. Mackinem's diagnostic opinion of C's troubles. *See* Mil.R.Evid. 702, 703, and 705. As such, however, the history would have been admissible only for this

limited purpose of illuminating the basis of the expert's diagnosis—and, thus, implicitly to support its weight—but not substantively, on the merits, as so-called "exculpatory evidence."

25. Now, however, appellant seeks to expand upon his trial-level theory of admissibility and use of this evidence. Specifically, in this Court he responds to the prosecutor's hearsay trial objection by arguing that Evelyn's statements to Dr. Mackinem should be seen as a collective exception to the hearsay rule, see Mil.R.Evid. 803(4); as such, it would be substantively admissible, on the merits of the issue of guilt.

26. This appellate argument, however, blatantly ignores defense counsel's forthright assurance at trial that the history was *"not being offered for the truth of the matter asserted"* (¶ 8) but only to show the basis of the doctor's diagnostic opinion. (Emphasis added.) In other words, trial defense counsel expressly eschewed offering the purported family history for the purpose now urged on appeal, so there simply was no denial of "exculpatory evidence" as appellant now claims.

27. In sum, the record does not support appellant's appellate contention that he was denied "exculpatory evidence"; indeed, it does not reflect that he even offered the evidence in question as "exculpatory." Given this limited scope of the evidentiary litigation and given, as well, the apparently limited substance of Evelyn's family-history statements to Dr. Mackinem, this case does not present to us the question whether double hearsay is admissible under Mil.R.Evid. 803(4)—*e.g.*, a medical expert testifying as to what a parent told the expert that the child had told the parent.

### Medical diagnostic opinion

■ 28. Regarding exclusion of Dr. Mackinem's diagnostic opinion of C's troubles, the earlier-quoted portions of the record indicate that appellant overstates what probably would have been the *doctor's* opinion. Further, had he offered an opinion as expansive as appellant anticipates in his brief, the only possibly helpful part to the defense as-

suredly would have been demolished on cross-examination. Either way, appellant was not prejudiced by Dr. Mackinem's not offering a diagnostic opinion of "C" in front of the members.

29. Surely, Dr. Mackinem was of the opinion that "C" reflected post-traumatic stress syndrome. Moreover, early in his proffered testimony, after lengthy discussion of types of parental violence and Mr. R's purported pattern of violence in particular, Dr. Mackinem stated: "It is a given that he had this exploiting, controlling type of domestic violence, and the information that I've gotten on the sexuality, I considered it very probable that [C] had been sexually molested." Under more extensive subsequent examination by both parties and the military judge, however, it seems entirely likely that Dr. Mackinem's actual medical diagnostic opinion would not have included speculation of sexual abuse.

30. For instance, shortly after the doctor's reference to sexual molestation, he forthrightly refused to follow defense counsel down the primrose path by opining that the post-traumatic stress syndrome had been brought on by stress from sexual abuse. Then, under cross-examination by trial counsel, he acknowledged that, when he had written that he could not "document" his "suspicion" that the two girls "were sexually abused," he meant that it was sheer "speculation." ¶ 13. He admitted that, if he "were to testify about sexual abuse of [C] occurring back in the early 80s, all [that he would be] doing is speculating." On later redirect examination by defense counsel, Dr. Mackinem explained that his inability to "document" sexual abuse referred to the lack of "some specific sign or manifestation from [C] that she had experienced sexual abuse."

31. Responding to additional questions, this time from the military judge, Dr. Mackinem conceded that even Evelyn had not told him that Mr. R "had sexually abused either child"; rather, her reports were limited to stories of physical abuse, "beatings." Dr. Mackinem testified that "C" had told him of her father's "physical abuse"—"being beaten" and "seeing her mother being beaten";

he never testified, however, that "C" ever had hinted that her father had sexually abused her. He insisted to the military judge that he had "never, ever stated there was" sexual abuse of the girls by Mr. R— only the "possibility" of it.

32. Finally, under renewed questioning by the military judge, Dr. Mackinem explained: "Then there are behaviors manifested that are specific to sexual abuse. Then there are behaviors manifested specific to any major childhood trauma." He revealed that the behaviors that he had seen exhibited by "[C] were not specific sex abuse behaviors. These were behaviors that could be found with any major childhood trauma." From the extensively developed record on this point, then, the following seems safe to conclude:

33. First, Dr. Mackinem would have offered a medical diagnostic opinion that "C" suffered from post-traumatic stress syndrome when he saw her in late 1984 and early 1985. With the doctor's unwillingness to connect this condition to C's accusation against appellant so as to support the defense theory of transference, however, the military judge concluded that such an opinion was irrelevant to this trial. *See* Mil.R.Evid. 401 (defines "relevant evidence"); *cf. United States v. Reece,* 25 MJ 93, 95 (CMA 1987)(Mil.R.Evid. 401 establishes "a low threshold of relevance"). While it is difficult to find an abuse of the judge's discretion in this regard, it is even more difficult to find any prejudice to appellant that emanated from the members not hearing this opinion.

34. Second, as appellant now claims in his brief, arguably Dr. Mackinem would have been willing to opine that, "based on the family history, [C] possibly suffered from sexual abuse prior to 1985." Final Brief at 11. With the obvious lack of any basis whatsoever in the record for such an opinion, however, there can be no legitimate claim that the military judge abused his discretion in discouraging such an opinion being offered to the members. *Cf. United States v. Suarez,* 35 MJ 374 (CMA 1992). Expert "speculation" is, notwithstanding, still "speculation." *See generally* Mil.R.Evid. 703 and 705.

35. In any event, even if Dr. Mackinem would have been willing to offer such an opinion and even if the military judge would have permitted it, the foregoing synopsis of the record in this regard abundantly demonstrates the devastation that such an opinion would have suffered under cross-examination. In that light, there can be no claim that appellant was prejudiced from any hypothetical evidentiary error.

**B**

■ 36. In the second granted issue, appellant represents that the military "judge erred when he refused to allow two defense witnesses to testify as to when they noted the children's behavior which would have indicated sexual abuse." Again the record is appellant's principal obstacle.

37. First, *no* witness was denied appellant who would have testified to seeing behavior from either of the girls that would have indicated sexual abuse. Only one was called, Mrs. Patton, and she in fact did testify.

38. Second, if the issue framed by appellant can be read to include argument that denial of certain testimony from Dr. Mackinem was erroneous and prejudicial to his case—which, from the briefs, apparently is appellant's contention but which is well-concealed in the issue itself—appellant again has overlooked, misread, or misrepresented the record. The military judge forthrightly put to the defense the option of pursuing with Dr. Mackinem the meaning of Mrs. Patton's observations of C's doll-play. Recognizing the potentially two-edged nature of that sword, however, the defense consciously declined to do so. ¶ 17.

39. Accordingly, our reading of the record does not reflect that appellant was denied any opportunity at all to present the type of evidence in question.

## III

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX, CRAWFORD, and GIERKE concur.