**UNITED STATES, Appellee**

v.

**Ricardo V. BUENAVENTURA, Specialist
U.S. Army, Appellant.**

No. 94–1365.
CMR No. 9200939.

U.S. Court of Appeals for
the Armed Forces.

Argued Oct. 5, 1995.

Decided Sept. 18, 1996.

For Appellant: *Captain Blair M. Jacobs* (argued); *Colonel Stephen D. Smith, Lieutenant Colonel John T. Rucker, Major Roy H. Hewitt* (on brief).

For Appellee: *Major Anthony P. Nicastro* (argued); *Colonel John M. Smith* (on .brief); *Lieutenant Colonel Eva M. Novak.*

*Opinion of the Court*

GIERKE, Judge:

A general court-martial composed of officer members at Fort Lewis, Washington, convicted appellant, contrary to his pleas, of rape (2 specifications), committing indecent acts on a child (2 specifications), and taking indecent liberties with a child, in violation of Articles 120 and 134, Uniform Code of Military Justice, 10 USC §§ 920 and 934, respectively. Based on his pleas of guilty, the court-martial also convicted appellant of unauthorized absence (7 days) and breaking restriction (2 specifications), in violation of Articles 86 and 134, UCMJ, 10 USC §§ 886 and 934, respectively. The approved sentence provides for a dishonorable discharge,

confinement for 12 years, total forfeitures, and reduction to the lowest enlisted grade. The Court of Military Review [1] affirmed the findings and sentence. 40 MJ 519, 526 (1994).

Our Court granted review of the following issues:

I

WHETHER THE MILITARY JUDGES ERRED BY PROHIBITING SPECIALIST BUENAVENTURA FROM PRESENTING HIS ONLY VIABLE DEFENSE TO THE PANEL: THAT THERE EXISTED TWO POSSIBLE SOURCES OF THE SEXUAL ABUSE OF HIS NIECE, HIMSELF AND ANOTHER RELATIVE, AND THAT HIS NIECE'S ALLEGATIONS ARE NOT INCONSISTENT WITH ACTUAL ABUSE FROM ONLY ONE OF THE TWO RELATIVES ACCUSED.

II

WHETHER THE MILITARY JUDGE ERRED BY IMPROPERLY ADMITTING THE TESTIMONY OF THE SCHOOL COUNSELOR UNDER MILITARY RULE OF EVIDENCE 803(24).

III

WHETHER THE MILITARY JUDGE ERRED BY PERMITTING THE VICTIM'S FATHER TO TESTIFY ABOUT HER DEMEANOR AT THE PRE–TRIAL HEARING, IN VIOLATION OF MILITARY RULE OF EVIDENCE 608.

We resolve Issue I in appellant's favor. Therefore, we need not address Issues II and III.

*Background*

Appellant was charged with five sexual offenses with his 8–year–old niece (AD). The charges involve two time periods. Two offenses were alleged to have occurred while appellant was visiting his sister and brother-in-law at Fort Lewis, Washington, before his deployment to Saudi Arabia. Three offenses were alleged to have occurred while appellant was again visiting his sister and brother-in-law after his return from Saudi Arabia. Appellant was charged with raping AD on "various and diverse occasions" from December 17, 1990, through January 3, 1991 (specification 1 of Charge I) and from August 16 through September 10, 1991 (specification 2 of Charge I). He was charged with committing indecent acts with AD "by rubbing his exposed penis against" her and fondling her breasts and genital area on "various and diverse occasions" during the same two periods (specifications 1 and 2 of Charge II). Finally, he was charged with taking indecent liberties with AD during the second period, August 16 through September 10, 1991, "by making her watch a pornographic" movie (specification 3 of Charge II).

*Evidence*

On Tuesday, September 10, 1991, AD, on her own initiative, reported to a school counselor, Ms. Sayre, that she had been sexually abused by appellant at her parents' Fort Lewis quarters. AD also reported that she had been abused by her maternal grandfather while he was living in the house. AD repeated these accusations to a therapist, Ms. Kramer, and a clinical psychologist, Dr. Peterson.

When AD talked to Ms. Sayre, she described appellant's abuse and her grandfather's abuse similarly. Ms.' Kramer testified that AD told her that both her grandfather and appellant abused her. Defense counsel proffered evidence that the grandfather would tell AD that "he was preparing her for marriage," that he would tell her, "you stink," have her undress and bathe, and touch her indecently while she was bathing. Ms. Sayre testified that AD said that appellant told her, "you stink," and told her to take a shower with him. Dr. Peterson testified that AD told him that both appellant and the grandfather had abused her.

The defense theory was that AD had been abused by the grandfather and had substituted appellant in her memory of the events. The defense requested the grandfather as a

---

1. *See* 41 MJ 213, 229 n. * (1994).

witness, but the proffer of his expected testimony was a denial that he had abused AD. The military judge refused to order production of the grandfather as a witness.

Defense counsel also requested permission to cross-examine AD and question other witnesses about the grandfather's abuse. Defense counsel proffered testimony from AD's father that her maternal grandfather lived in their home from February 1989 until April 1991, and that he found AD naked in bed with her grandfather. This proffer was later validated, except for the date of the grandfather's departure from the home, when AD's father testified at a session under Article 39(a), UCMJ, 10 USC § 839(a), after findings. He testified that both appellant and AD's grandfather moved in with them in February 1989. Shortly thereafter, appellant enlisted in the Army. The grandfather moved out of the house sometime between December of 1989 and March of 1990, and AD's father took him back to California some time in April 1990.

AD's father testified in the presentencing Article 39(a) session that he suspected the grandfather had abused AD. He testified that he saw his children watching pornographic movies in the grandfather's room. He testified further as follows:

> I'd put my daughter in the bed in the evenings, in the morning I'd get up to go to work and she'd be in my grandfather—in her grandfather's bed. She would get up—I'd be drinking a cup of coffee, on one occasion when she came and sat on my lap and she didn't have any underwear on. She had on her nightgown, but no underwear. And I asked her why she didn't have any underwear on, and she said, "Granpa took them off last night," and that he had put her in his bed....

Defense counsel also proffered evidence that the grandfather engaged in oral sodomy and sexual intercourse with AD, and used the ploy of telling AD, "you stink," and then abused her while she bathed. The military judge refused to allow any cross-examination about the grandfather's alleged abuse.

Ms. Sayre, the school counselor, and Ms. Kramer, AD's therapist, both testified that AD had told them about appellant's abuse. In their testimony on the merits, they did not mention AD's reported abuse by her grandfather.

Ms. Sayre testified that AD sought her out, saying, "Ms. Sayre, I was looking for you." When Ms. Sayre asked, "[W]hat about?," AD said, "Well, I told my teacher that I didn't feel good and I needed to see the school counselor." Ms. Sayre testified that AD "was kind of hunched over like that (lowers head) and I thought maybe she didn't really feel good." Ms. Sayre asked why AD did not go to the school nurse, and AD replied, "No, I want [to] talk to you. I have something terrible that happened to me that I want to tell you about." She testified that AD told her that appellant "had been doing some bad things to her"; that "the most recent incident had just happened that weekend before she came in to talk to me"; and that "the first incident that she related to me was about ... when her Uncle Rick had gotten back from Saudi Arabia." Ms. Sayre described her conversation with AD as follows:

> I remember just sitting there, trying not to show a stunned look on my face because of the nature of the—what she told me. She said, "My Uncle Rick got—on the night that my Uncle Rick got back from Saudi Arabia, I had just gone to bed and I heard Uncle Rick say goodnight to my family and told them he was going to bed, and then I saw my door open—the lights were out—and my Uncle Rick said, 'Shsssss' and he closed the door. And then he closed the door and then he came over to my bed and told me he was going to get in bed with me and for me not to say anything and that he would give me a toy or take me to Chuck E. Cheeses. And then he got in bed with me and told me to take my pajamas off and my underwear. He then laid right next to me and he put his private part in my private part."

> \* \* \*

> I remember her saying that she told him to stop and he didn't, and it hurt. He didn't stop. He told her that if anybody came in the room that she was supposed to

get up and go into the bathroom and act like nothing happened. After, he did stop and she said he squirted some white stuff on her tummy. And then he told her to get up and go wash up in the bathroom, and that was the end of that.

\* \* \*

[S]he said that her Uncle Rick had one time wanted her to—to play house with her. He told her that she was supposed to act like the wife and he was going to be the husband. She was supposed to kiss him, as if they were married—pretend like they were married. She said she went to kiss him on the mouth, like a quick peck on the mouth and he grabbed her and kissed her for a really long time on her mouth, and at that time put his private part in her.
She then told about one time when he showed her an X-rated film and kissed her for a long time in the mouth and put his private part in her.

\* \* \*

The final thing that she told me was—she said, "When my mom and dad went to California, Uncle Rick told me ——" She was in the bathroom and he came in and said, "[AD], you stink. You need to take a shower with me." She said, "No." She said she tried to leave the bathroom and he said, "Well, you come here with me." He took her in his bedroom and proceeded to put his private part in her again.

\* \* \*

For me to get a time frame on this, I asked her when these things happened . . . because the first incident that she told me was about Saudi Arabia. She said, "Some happened before Saudi Arabia, some happened after." The one that she said about when he was playing house with her, she thought it was about a month before the day that she was reporting it to me.
The incident about California she recalled it being three or four days ago. She thought it was on a Friday, and that would have been the Friday before she reported to me—that weekend.

Ms. Sayre testified that "[t]he whole time she talked to me she was kind of looking down and wouldn't look at me. It was a monotone—it was kind of like she pulled it out gradually, in a monotone voice." Ms. Sayre said that this demeanor was the same demeanor she had noticed when AD first approached her outside.

AD testified on the merits. To many questions, she did not respond or responded only by nodding her head. Trial counsel tried using a trusted adult, sworn in as an "interpreter," so that AD could whisper her answers. This met with only limited success because AD did not want to testify in the presence of appellant.

Trial counsel then tried to elicit testimony using drawings of an adult male and a juvenile female. Finally, trial counsel succeeded in having AD write down her answers and having them read to the court members.

Using this method of writing down her answers, AD then testified that on the night appellant returned from Saudi Arabia, he came into her room and "tried to stick his private part in mine." Because it was painful, AD said, "Ouch," and appellant responded, "Oh, come on.... It's not even in." When asked how far she felt appellant penetrate her, AD demonstrated a distance described by the military judge as "[s]omething less than an inch." AD testified further that appellant was "moving up and down." Finally, she testified that she saw appellant's "private part" and it was pointed "[u]p."

Trial counsel asked AD if the night of appellant's return was the first time he "did anything like that to you[.]" She responded, "No."

AD testified further that there were two occasions after appellant's return from Saudi Arabia when "[s]ome white stuff came out." She said that it happened once on the floor of the living room and once in her bedroom. She also said that appellant showed her a "bad movie" before the incident in the living room, in which "[t]his guy was sticking his private part in somebody's behind." She said that appellant told her she would learn what the "white stuff" was when she grew up. Appellant called it "come." AD said some of the "white stuff" landed on her legs.

She described it as "[j]ust a tiny bit sticky" and somewhat "warm."

AD described a second post-Saudi Arabia incident in her room. She said appellant told her to come into her bedroom and said, "I have a surprise for you." Appellant told her to lean against her dresser, pulled down her pants, pulled down his own pants, and "tried to put his private part in mine." She said that "[t]he white stuff came out" and landed on the carpet. When he heard AD's brother come into the house, he told AD "to run to the bathroom and wash up."

AD testified that she could not remember any times when appellant put "his private part in" hers, except the three she had described. AD testified that there were other times when appellant "did other things, other than putting his private part in" hers. She said that "[s]ometimes he would touch my upper chest." She also said that on one occasion appellant asked her to move her hand "[u]p and down" on "[h]is private part."

Finally, she testified that appellant told her "to promise not to tell anybody about the movie." When asked if appellant promised to give her anything if she "did what he wanted" her to do, she responded in the negative.

During a recess between direct examination and defense cross-examination, AD told defense counsel that she had been instructed "not to talk about" her grandfather's abuse. On cross-examination, AD acknowledged talking to defense counsel about a promise involving "Chuck E. Cheese," but that "it wasn't about this." She also testified that she had seen "these gross movies" on an earlier occasion, "long before anything" happened with appellant.

Dr. Richard Peterson, a clinical psychologist, testified for the prosecution. Originally, he had been made available to assist the defense. Defense counsel made no claim of privilege and no objections to his testifying. There was no dispute about his qualifications or the validity of his conclusions.[2] The only dispute was whether his testimony about abuse by the grandfather should be excluded under Mil.R.Evid. 412, Manual for Courts-Martial, United States (1994 ed.).

At an Article 39(a) session to determine admissibility of his testimony, the doctor testified that it is common for abused children to delay reporting the abuse. He explained the reasons as follows:

> About half of the children delay in their reporting. The reasons can be as simple as not wanting to talk about something that's very embarrassing to them. The reason may also be that the child is afraid of retribution or some type of harm that may come to them or to a member of their family that's been threatened. The child may be unaware of how wrongful an act is, and, therefore, simply not flag it as something important to talk about. The child may have also been encouraged to keep the secret by an individual who has manipulated the child into believing that they have a special relationship by using bribes or money—of money or candy or special attention—in order to do that. Children may also not want to upset a parent if that parent is upset.

\* \* \*

> Delays in reporting are common regardless of the kind of abuse that's inflicted on a child. Oftentimes a child will talk about a less serious act of abuse, and then there will be found physical evidence of more serious acts.

Asked to comment on inconsistencies in reporting, Dr. Peterson testified as follows:

> Inconsistencies in the specifics of the reports of abuse are not unlikely, given that children are often molested more than once, and they are reporting what they remember of the abuse, not of a specific instance of abuse, and it tends to be more schematic than it is specific to each individual episode of abuse.

Dr. Peterson was asked to describe the accuracy of a child's memory, and he testified as follows:

---

**2.** Because the parties did not contest the scientific validity of Dr. Peterson's theories, we need not decide as a matter of law whether they are scientifically valid.

Children of age eight or nine have a memory which falls in between that of a five year old and an adult. They do have available to them more strategies for inputting information and retrieving information than does a five-year-old child, but they are not as clear in that structure and organization, or they're not able to use those strategies as efficiently as an adult. The memory falls in between that of a young child and that of an adult, but a child of eight or nine would be able to remember most important things that have happened to them, retrieve that information and pass it on spontaneously.

Dr. Peterson was asked to comment on the "concept in memory" of "recency." He testified that " '[r]ecency' refers to the fact that the most recently occurring events are best remembered.... Recall is best for those because there is nothing which interferes— there is not as much interference with the first event or the last event, but the things in the middle tend to blend together."

Asked about "cross-modal memory," Dr. Peterson gave examples of being "able to identify what an object would feel like having seen only a picture of that object, or to remember what an object tastes like having been given a picture of that object."

Dr. Peterson was asked about a child's concept of time. He explained that a child of age eight or nine is "probably not as highly detailed or highly specific as an adult's concept of time would be ... but they are aware of the sequence of events; they are aware of how things order in time, even though they are not able to categorize it accurately in terms of the relationship between those events."

On cross-examination, Dr. Peterson was asked whether it is correct that "multiple persons—not just multiple acts, but multiple persons—can, in fact, confuse the children with regard to attribution of one act or another." He responded, "That's correct."

Dr. Peterson testified that he tested and interviewed AD and diagnosed her as showing "signs" of "post-traumatic stress ... disorder." He was asked how a "post-traumatic stress disorder affect[ed] the concept of recency," and he explained that persons with the "disorder relive the events in their entirety and ... with the graphic detail that suggests that the memory is very particular and very precise and very specific to the events that occurred, including they can remember odors, smells, sensations, places." He testified further that, as a result of a post-traumatic stress disorder, "recency would not apply because of ... the vividness of the recall of the original post-traumatic event—the stressful event."

Dr. Peterson testified that AD told him she had been abused by her grandfather as well as by appellant. Asked whether cross-modal memory could explain why AD "has the ability to talk about some of these other feelings," Dr. Peterson testified: "It is a likely hypothesis that needs to be considered."

Defense counsel asked Dr. Peterson about "normalization," as well as "a phenomenon known of integrating a non-abusing person in the normalization process." Dr. Peterson answered as follows:

Given the limited strategies a child has available to them to deal with events which are outside [the] realm of normal experience, it would not be unusual for a child to attempt to make sense of something that was horrific by replacing the individual who abused them with someone who is much more acceptable....

When the defense cross-examination of Dr. Peterson concluded, defense counsel argued: "Either Doctor Peterson should be allowed to testify to everything that we just went through here today in the way it was done or the Government should not be allowed to put him on at all."

The military judge questioned Dr. Peterson further about the concept of normalization by integrating a non-abuser into the memory. Dr. Peterson testified that it is possible for children to persist in "rather unbelievable and expanding allegations." He explained that the child's persistence can be "a response to the demand characteristics of the interviews, and ... it can be that the interview process itself can contaminate and

provide other factors which may force a child to maintain whatever was at the beginning fictionalized or fantasized." Whether a child will adhere to integration of a non-abuser "depends upon the child and it depends upon the circumstances of the interview and challenges."

The military judge asked Dr. Peterson about the effect of post-traumatic stress disorders on the accuracy of memory. Dr. Peterson responded:

The accuracy of recall of the events of abuse is not clear because there is evidence in the literature that children do not always recall accurately what they experienced. The jury is still out as to the degree to which they have accurate recall. What is generally reported, especially for the younger children and it's less true for the older children, is that if you allow spontaneous recall and do not ask leading questions, you tend to get less information, but more accurate information. . . .

The military judge ruled that "we are not relitigating this issue" regarding the evidence of other abusers. Thereafter, defense counsel informed the military judge that there would be "[n]o cross-examination, Your Honor, given the court's limitations."

Before the members, Dr. Peterson testified about delayed reporting, inconsistent reporting, cross-modal memory, and children's concept of time. Regarding inconsistent reporting, he testified: "Children who have been abused, particularly those who have been abused in multiple situations, will confuse a lot of their memories and report the general ideas of the abuse that they've experienced rather than the specifics of any one time."

On the subject of "cross-modal memory" he testified:

Cross-modal memory is being able to identify or respond to an event which has been presented through one modality—for example, vision—and to understand what it would feel like or smell like or taste like through another sensory modality. . . . But to be able to generalize across modalities, the information has to be in-coded in such a way or you have to have experience with that information which would allow you to create information about the particular sense of modality that's being set out.

After trial counsel completed his direct examination, defense counsel argued that "the answer to the cross-modality has opened the door to previous closed areas for cross-examination." Defense counsel stated that they had a "good faith belief" that the victim would testify that she had been abused by her grandfather. This belief was supported by Dr. Peterson's testimony during the Article 39(a) hearing, in which he stated that the victim had told him that she had been abused by her grandfather; defense counsel's conversation with AD after her direct testimony; and the testimony of Ms. Sayre and Ms. Kramer during Article 39(a) sessions concerning hearings concerning admissibility of their testimony. Defense counsel argued that the court members would conclude that "this defendant must have abused the child because otherwise the child would not have known about that concept; and since we know that the child not only has had similar experience with grandpa, I believe that to allow them to leave with this inference now would be irreparable prejudice to the defendant." The military judge ruled that the Government had not "opened the door" to such cross-examination. Thereafter, defense counsel elected, "[o]n reflection," not to cross-examine.

The defense rested without presenting any evidence on the merits.

Trial counsel's closing argument focused on the believability of AD's testimony. Defense counsel's closing argument takes only 12 typed lines and less than half a page of the record. He argued that AD did not "lie . . . about what she perceived happened," but her testimony "is not inconsistent" with appellant's innocence.

### Evidence of Abuse by the Grandfather (Issue I)

■ Appellant argues that the military judge's refusal to permit cross-examination of AD, Dr. Peterson, and other witnesses about sexual abuse by the grandfather deprived him of his Sixth Amendment right to present a defense. He argues that the prof-

fered evidence would have tended to show that AD had substituted appellant for the grandfather in her recall of the sexual abuse. The Government argues that such evidence was not constitutionally required to be admitted because it was not favorable to the defense. The Government argues that sexual abuse by the grandfather "makes it no less likely that appellant molested the victim."

We believe that the Government's argument misses the mark. Even if both appellant and the grandfather abused AD, the evidence raises a factual question whether appellant committed *all* the offenses charged. The triers of fact could not determine whether AD substituted appellant for the grandfather for *any* of the offenses charged unless appellant was allowed to cross-examine AD and the other witnesses about that possibility.

 Mil.R.Evid. 412 prohibits evidence of the victim's past sexual behavior unless it "is constitutionally required to be admitted," or it is "offered by the accused upon the issue of whether the accused was or was not, with respect to the alleged victim, the source of semen or injury[.]" Our standard of review of a military judge's decision limiting cross-examination is abuse of discretion. *United States v. Williams*, 37 MJ 352, 361 (CMA 1993), citing *Geders v. United States*, 425 U.S. 80, 86–87, 96 S.Ct. 1330, 1334–35, 47 L.Ed.2d 592 (1976). Whether evidence is "constitutionally required to be admitted" is reviewed on a case-by-case basis. *See Sandoval v. Acevedo*, 996 F.2d 145, 149 (7th Cir.1993). If the military judge commits constitutional error by depriving an accused of his right to present a defense, the test for prejudice on appellate review is whether the appellate court is "able to declare a belief that it was harmless beyond a reasonable doubt." *United States v. Bins*, 43 MJ 79, 86 (1995), quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (other citations omitted); *see United States v. Williams*, 40 MJ 216, 219 (CMA 1994), citing *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); *see generally* S. Chil-

dress & M. Davis, 2 *Federal Standards of Review* § 7.03A (2d ed.1992).

Throughout the trial, defense counsel argued that evidence of the grandfather's sexual abuse was admissible to show that the grandfather was the source of AD's post-traumatic stress disorder. Defense counsel further argued that the evidence was constitutionally required to be admitted because it would show that the victim was mistaken about the identity of her assailant.

Reduced to its simplest terms, appellant's defense was mistaken identity. The defense conceded that AD had been abused but wanted to show that she had mistakenly identified appellant as her abuser.

 Evidence of past sexual behavior may be "constitutionally required to be admitted" to show a motive to fabricate an accusation. *See United States v. Williams*, 37 MJ at 359–60; *United States v. Dorsey*, 16 MJ 1, 7 (CMA 1983). Past sexual behavior also may be "constitutionally required to be admitted" to explain how the victim acquired sexual "knowledge beyond her tender years" or to corroborate the accused's version of facts. *See United States v. Gray*, 40 MJ 77, 80 (CMA 1994); *United States v. Hurst*, 29 MJ 477, 481 (CMA 1990).

Recently, we have had two cases involving evidence that a child-victim may have substituted one person for another in her memory of sexual abuse. In *United States v. Gober*, 43 MJ 52, 59 (1995), we held that an expert's opinion, "based on the family history," that the victim "possibly suffered from sexual abuse" and had attributed that abuse to the accused by a process of memory transference, was too speculative and lacking in probative value to pass the test of Mil.R.Evid. 412.

In *United States v. Pagel*, 45 MJ 64 (1996), we held that proffered evidence of a one-time assault by a stranger was too dissimilar and remote in time to be admissible. In *Pagel* a stranger had allegedly fondled, kissed, and got on top of the victim, at a location away from the family home, several years before the accused's 2–year period of fellatio and cunnilingus with the victim in the family home.

In *United States v. Begay*, 937 F.2d 515 (10th Cir.1991), the Court of Appeals held that it was reversible error to reject proffered evidence, supported by expert testimony, that an 8-year-old girl may have confused instances of sexual abuse by another with those committed by the defendant. The court said that "we conclude that cross-examination about the Jim incidents was relevant and probative on the central issue whether D's memory was clear and accurate on critical details about the Begay incident as contrasted with the Jim incidents." 937 F.2d at 521.

Appellant's case differs from *Pagel*, where the earlier abuse was at a different location, remote in time, involved different acts, and was unsupported by expert testimony. Appellant's case also differs from *Gober* because the expert testimony in appellant's case was based on interviewing and testing the victim and familiarity with the facts relating to both appellant's abuse and the grandfather's abuse.

On the other hand, appellant's case is factually similar to *Begay*. Both cases involved two adult men sexually abusing a child. Both cases involved similar acts, and the acts were close in time. *See Begay, supra* at 519, 521.

Here, the members were left with the impression that AD's sexual knowledge was acquired from appellant. They did not know that appellant's alleged abuse was preceded by over a year of alleged abuse by the grandfather. The members heard Dr. Peterson's expert testimony explaining why the victim's memory was sufficiently reliable to permit conviction, but the defense was precluded from presenting Dr. Peterson's testimony about the possibility that the victim had substituted appellant for her grandfather for all or some of the offenses. *See United States v. Sanchez*, 44 MJ 174, 182 (1996) (Everett, S.J., and Gierke, J., concurring in the result) ("without a proffer of" expert testimony, "it is mere speculation—indeed, curious speculation, at that—that the victim would accuse appellant of rape" but not others "similarly situated"); *United States v. Colon-Angueira*, 16 MJ 20, 30 (CMA 1983) (Everett, C.J., concurring) (proffer would have been stronger if expert testimony linked evidence).

AD's description of appellant's abuse and her grandfather's abuse were similar in several respects. Both were described as being preceded by pornographic movies, both occurred in the family home, and both were associated with bathing. We hold that the military judge abused his discretion in excluding the evidence.

Like the court in *Begay*, we do not discount the strength of the prosecution's case. Nevertheless, we are not satisfied beyond a reasonable doubt that the military judge's erroneous restriction of the defense case was harmless. Accordingly, we must reverse.

### Decision

The decision of the United States Army Court of Military Review is reversed. The findings of guilty and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Chief Judge COX, Judge SULLIVAN, and Senior Judge EVERETT concur.

CRAWFORD, Judge (dissenting):

I dissent because the majority opinion undermines the rape shield law in the United States and departs from the requirement that the defense establish the legal relevance, logical relevance, and reliability of its evidence.

As the majority notes, the defense at numerous sessions sought to introduce evidence of a second abuser based on various theories including: substitution, transference, cross-modal memory, recency, and integration. An additional theory offered was that the victim suffered from post-traumatic stress disorder, an "injury" within the meaning of Mil. R.Evid. 412(b)(2)(A), Manual for Courts-Martial, United States (1994 ed.).

### Relevance and Reliability

In a unanimous opinion of this Court, we summarized the "analytical model" for evaluating "admissibility of expert testimony"— *United States v. Combs*, 39 MJ 288, 290 n. 1 (CMA 1994): Under this approach, the evi-

dence must be logically relevant, legally relevant, and reliable. *See United States v. Houser,* 36 MJ 392, 399 (CMA 1993). As noted in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 595, 113 S.Ct. 2786, 2797–98, 125 L.Ed.2d 469 (1993), the litmus test is the evidence's "relevance and reliability." *See also Montana v. Egelhoff,* — U.S. —, —, —, 116 S.Ct. 2013, 2017, 2024, 135 L.Ed.2d 361 (1996). This requires the proponent to establish the validity of the underlying theory of unconscious transference to appellant of the facts relating to any episodes with the grandfather.

No evidence was offered by the defense as to the validity of the underlying theory of transference, cross-modal memory, integration, etc. Thus, the judge properly exercised his role as the "gatekeep[er]" in excluding the evidence. *Daubert,* 509 U.S. at 597, 113 S.Ct. at 2798–99. There is no Sixth Amendment right to introduce evidence unless it is legally relevant, logically relevant, and reliable. *Montana v. Egelhoff, supra; Davis v. Alaska,* 415 U.S. 308, 320, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974); *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973). The judge should not remain passive when the parties have neglected to establish the requisite relevance and reliability. *United States v. Ferdinand,* 29 MJ 164, 167 (CMA 1989) ("judge is not merely a passive observer"); *United States v. Graves,* 23 USCMA 434, 437, 50 CMR 393, 396 (1975) ("The trial judge is more than a mere referee...."); *United States v. Wilson,* 7 USCMA 713, 716, 23 CMR 177, 180 (1957); ABA Standards, The Function of the Trial Judge, Introduction at 3 (Approved Draft 1972) ("the judge is not ... a mere functionary").

### Rape Shield Rule

The majority's theory that post-traumatic stress disorder is an "injury" within the meaning of Mil.R.Evid. 412(b)(2)(A) runs contrary to Congressional intent. *See United States v. Shaw,* 824 F.2d 601, 607 (8th Cir.1987); J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 412[01] at 412–16 to 17 (1992). The case cited by the majority, *United States v. Begay,* 937 F.2d 515 (10th Cir. 1991), is contrary to the position advanced. In *Begay,* the prosecution "relied heavily" on the testimony of the expert that there was physical injury to the victim. 937 F.2d at 520 and 521 n. 8.