**UNITED STATES**

v.

**Edwin J. CHRISTIAN, Gunnery Sergeant (E–7), U.S. Marine Corps.**

**NMCCA 200100734.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 30 May 2000.

Decided 16 May 2005.

Capt James Valentine, USMC, Appellate Defense Counsel.

J. Goldfoot, S. Delery, A. Nathan, Civilian Counsel for Amici Curiae.

Capt Glen R. Hines, USMC, Appellate Government Counsel.

LCDR R.W. Sardegna, JAGC, USNR, Appellate Government Counsel.

LT Lars C. Johnson, JAGC, USNR, Appellate Government Counsel.

Before DORMAN, Chief Judge, PRICE and CARVER, Senior Judges.

PRICE, Senior Judge:

Contrary to his pleas, the appellant was convicted of violation of a lawful general order (seven specifications), consensual sodomy, assault consummated by a battery (five specifications), adultery, indecent language (three specifications), and indecent assault (three specifications). The appellant's offenses violated Articles 92, 125, 128, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 892, 925, 928, and 934. A military judge sitting as a general court-martial sentenced the appellant to confinement for 12 months, reduction to pay grade E-1, and a bad-conduct discharge. The convening authority "changed" the findings of guilty of the three specifications of indecent assault to findings of guilty of the lesser included offense of assault consummated by a battery under each specification. The convening authority approved the findings as changed and approved the sentence as adjudged.

The appellant now asserts as error that: (1) the conviction for private, consensual, heterosexual oral sodomy between adults is unconstitutional; (2) the military judge abused her discretion in denying a motion to strike the testimony of a key Government witness who invoked her right against self-incrimination during cross-examination; (3) the charges of indecent assault and indecent language were unreasonably multiplied with the charges of sexual harassment; (4) the evidence of assault consummated by a battery during an athletic contest was legally and factually insufficient; and (5) the sentence is inappropriately severe.

We have carefully considered the record of trial, the assignments of error, the Brief of Amici Curiae in support of the appellant[1], the Government's response, and the excellent oral arguments. As modified, we conclude that the findings and the sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a) and 866(c).

**Background**

The appellant was assigned as a recruiter in Staunton, Virginia. His wife lived in their home in Woodbridge, Virginia, during his assignment in Staunton. In the course of his recruiting work, the appellant became acquainted with Ms. RW, a senior in high school. At the time they met, she was 17 years old; she turned 18 shortly thereafter. He met RW through one of her friends, a "poolee" who had enlisted in the Marine Corps delayed entry program. At the appellant's request, RW worked in the recruiting office as a volunteer tutor for prospective applicants who needed help passing the Armed Services Vocational Aptitude Battery test.

Gradually, the relationship between the appellant and RW evolved from acquaintanceship to sexual relations. Beginning in about April 1996, they had sexual intercourse and oral sodomy frequently at his apartment. However, on more than 20 occasions, they also had intercourse and oral sodomy in his private office at the recruiting station. All of the sexual relations were consensual.

In May 1998, the appellant transferred to Marine Corps Recruit Depot (MCRD), San Diego, California and was assigned to the Provost Marshal's Office. While serving as one of two section chiefs, the appellant sexually harassed three junior female Marines who worked in the office, as well as the civilian wife of a subordinate noncommissioned officer. The harassment consisted of numerous incidents of inappropriate comments and physical contact, which comprise

---

1. The amici curiae referred to in this opinion are represented in the Brief of Amici Curiae in support of the appellant on behalf of the American Civil Liberties Union Foundation, the American Civil Liberties Union of the National Capital Area, Lambda Legal Defense and Education Fund, Inc., and the Servicemembers Legal Defense Network.

the convictions for indecent language and assault. He also fraternized with two other junior female Marines.

Despite his cross-country transfer, the appellant chose to continue his relationship with RW. In early August 1998, the appellant's wife and infant daughter moved to San Diego. Apparently unaware of her husband's relationship with RW, Mrs. Christian agreed with the appellant to hire her to be a nanny in their home. RW lived with the Christians in San Diego for about five months. During this time, she and the appellant continued to have intercourse and oral sodomy. Most of these acts occurred in the Christians' residence, sometimes while Mrs. Christian was present in the home but unaware of the behavior. The other incidents occurred in a hotel in the San Diego area. There was no evidence that the appellant and RW had any sexual relations in his office at MCRD, San Diego.

About midway through her stay with the Christians, RW began to withdraw hundreds of dollars from one of the Christians' bank accounts without authority or permission. Mrs. Christian eventually fired RW, and, shortly thereafter, RW returned to Virginia.

### Constitutionality of Art. 125, UCMJ, As Applied to Appellant

■ The appellant asserts that, under *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003), his Article 125, UCMJ, conviction for consensual sodomy is unconstitutional. We disagree.

Whether the appellant's conviction for consensual sodomy must be set aside in light of *Lawrence* is a constitutional question we review *de novo*. *United States v. Marcum*, 60 M.J. 198, 202 (C.A.A.F.2004)(citing *Jacobellis v. Ohio*, 378 U.S. 184, 190, 84 S.Ct. 1676, 12 L.Ed.2d 793 (1964)).

In *Lawrence*, the United States Supreme Court reversed a Texas state court conviction for private, consensual, same-sex sodomy. 539 U.S. at 579, 123 S.Ct. 2472. Under the facts of that case, the Court reasoned that the Due Process Clause of the Fourteenth Amendment protected one's liberty to engage in homosexual sodomy, thus the Texas statute prohibiting this conduct was unconstitutional. *Id.* at 578, 123 S.Ct. 2472.

In *Marcum*, the Court of Appeals for the Armed Forces considered the application of the *Lawrence* decision to Article 125, UCMJ, in a military context. The *Marcum* court rejected the argument that, under *Lawrence*, Article 125, UCMJ, was unconstitutional on its face. It stated that "an understanding of military culture and mission cautions against sweeping constitutional pronouncements that may not account for the nuance of military life." *Marcum*, 60 M.J. at 206. Instead, the court adopted a tripartite framework to determine whether Article 125, UCMJ, is constitutional as applied to the facts of a given case.

> First, was the conduct that the accused was found guilty of committing of a nature to bring it within the liberty interest identified by the Supreme Court? Second, did the conduct encompass any behavior or factors identified by the Supreme Court as outside the analysis in *Lawrence*? Third, are there additional factors relevant solely in the military environment that affect the nature and reach of the *Lawrence* liberty interest?

*Id.* at 206–07 (internal citation omitted). The court went on to explain each of these three questions.

As to the first question, the court inquired whether "[the] Appellant's conduct involve[d] private, consensual sexual activity between adults?" *Id.* at 207. If it did, the conduct would implicate the *Lawrence* liberty interests and require further inquiry regarding the second and third questions.

In explaining the second question, the court asked:

> "whether Appellant's conduct nonetheless encompassed any of the behavior or factors that were identified by the Supreme Court as not involved in *Lawrence*. For instance, did the conduct involve minors? Did it involve public conduct or prostitution? Did it involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused?"

*Id.* (internal citation omitted). If so, then *Lawrence* does not afford constitutional sanctuary.

The third question inquires whether there are "additional factors relevant solely in the military environment, not addressed by the Supreme Court, that affect the reach and nature of the *Lawrence* liberty interest in the context presented." *United States v. Stirewalt,* 60 M.J. 297, 304 (C.A.A.F.2004), *cert. denied,* — U.S. —, 125 S.Ct. 1682, 161 L.Ed.2d 482 (2005).

With respect to the first question, we assume that the appellant's sexual conduct at issue was both private and consensual.[2] As to the second question, we find that the appellant's sexual conduct at issue is not specifically excepted from the *Lawrence* analysis. For example, this case does not involve minors or persons who might be coerced or injured or who are situated in relationships where consent might not easily be refused. Nor does it involve prostitution or clearly public acts of sodomy.

The third question, which concerns factors "relevant solely in the military environment," *Marcum,* 60 M.J. at 207, necessitates a review of the factual context for the appellant's sodomy. When he met RW, the appellant was a 30–year–old staff sergeant (E–6) in the Marine Corps. At the time, RW was a 17–year–old high school student. The appellant asked her to come to the recruiting office to help tutor candidates for enlistment, although the record is bereft of any evidence that she was qualified to do so. After doing very little actual tutoring, the appellant asked her to come to his apartment. Nothing in the record suggests that the appellant had official business in mind in tendering that invitation. In short order, the appellant had successfully engaged RW in a sexual relationship including intercourse and sodomy.

We note that the appellant met RW because he was a military recruiter and one of her friends was a poolee. In other words, but for his recruiting assignment and recruiting duties, it is unlikely we would be con-

fronted with this conviction and appeal. We note that, at the time, the appellant was bound to comply with a lawful general order issued by the Commanding General, Marine Corps Recruit Depot/Eastern Recruiting Region, which included the following language:

> In recent years, nonprofessional personal relationships between recruiting personnel, members of the DEP [Delayed Entry Program], and prospective recruit applicants have become an increasingly serious problem which will undermine the integrity of professional relationships, debilitate morale by invading individual privacy, and interfere with the productivity and mission of the command. The most effective way of dealing with this problem is for recruiting personnel to conduct themselves in accordance with the highest professional standards when dealing with members of the DEP or prospective recruit applicants. This Order requires recruiting personnel in the ERR [Eastern Recruiting Region] to maintain only professional relationships with members of the DEP and prospective recruit applicants, and prohibits conduct which encourages or solicits financial transactions of any kind, inappropriate social relationships, intimate acts of any kind, or any sexual relationships by any recruiting personnel with any member of the DEP or any prospective recruit applicant.

Depot Order 1100.5 at 1 (16 Dec 1993). Thus, the appellant's conduct with RW was "more than a personal consensual relationship in the privacy of an off-base apartment." *Stirewalt,* 60 M.J. at 304. The appellant was sent to Staunton, Virginia to portray the Marine Corps in the best possible light in that community and to enlist eligible citizens to serve in the Corps. Disregarding his obligation to set a good public example, he betrayed his marital obligations, his Marine Corps obligations, violated the spirit of Depot Order 1100.5, and even used an official facility to carry on his illicit relationship.

We do not regard the continuation of the appellant's illicit relationship with RW in California as changing the tenor of our analysis.

---

2. However, we do not decide whether sexual activity that occurs in an individual office in a     recruiting station is "private."

In fact, his actions at the Provost Marshal's office support a conclusion that "additional factors relevant solely in the military environment ... affect the nature and reach of the *Lawrence* liberty interest[.]" *Marcum*, 60 M.J. at 207. Gunnery Sergeant (GySgt) Gibel testified that he was present when RW visited the appellant in the Provost Marshal's office at MCRD, San Diego. On more than one occasion, she would go into the office and the door would shut. Later, the appellant showed GySgt Gibel photographs of RW in various states of undress. GySgt Gibel testified that the appellant boasted that he was "cool and chicks dig him" in explaining how he got RW to pose for him in the photographs. Record at 592.

Answering the third *Marcum* question in the affirmative, we conclude that the appellant's consensual sodomy in Virginia and California "fell outside any *protected* liberty interest recognized in *Lawrence* . . . ." *Stirewalt*, 60 M.J. at 304 (emphasis added). In other words, the factual context for the appellant's sodomy implicated military-specific interests that warranted prosecution by court-martial. Accordingly, Article 125, UCMJ, is constitutional as applied to the appellant.

### Right of Confrontation and Motion to Strike Testimony

The appellant contends that the military judge abused her discretion by refusing to strike all of RW's testimony. The motion to strike was offered by the defense counsel after RW refused to answer questions during cross-examination and relied on her Fifth Amendment right against self-incrimination. We conclude that any error by the military judge in this regard was harmless beyond a reasonable doubt.

After RW offered extensive testimony during direct examination, she answered several questions in cross-examination. After confirming that she lived with the Christians for a few months, she was asked if she stole some money from the Christians' bank accounts. RW replied that, pursuant to legal advice, she declined to answer that question and exercised her rights under the Fifth Amendment. She then answered a few more questions from the defense counsel. In re-

sponse, among other things, she testified that she had some conversations with Mr. Steve Carneal from the bank. She did not elaborate on the nature of the conversations. When asked if she appropriated for her own use a credit card belonging to the Christians, she again invoked her constitutional right. RW answered all additional questions in cross-examination. Redirect examination and examination by the court followed. In recross examination, defense counsel asked her if her handwriting appeared on Defense Exhibit B, a Priority Mail envelope and copies of several money orders. For a third time, RW invoked her right against self-incrimination.

Defense counsel then requested that the military judge order RW to provide handwriting exemplars to prove that she sent money orders to the Christians. This colloquy ensued:

MJ: Okay. And what will be the relevance? What will be the relevance—assuming that the handwriting examination shows that this is [RW's] handwriting on the envelope and to these money orders, what will be the relevance of that fact?

CC: The relevance to that fact ties directly to the theft of $5,100 in money via ATM machine about which she has—Karneel [sic] is the magic word here—about which she has refused to answer questions. That goes to her motive to allegate [sic], if you will, against the Gunnery Sergeant and to—and to falsify her testimony. It might be—the theory is that she did this and she got busted by Karneel [sic] for it so-to-speak. She then has this—she then has the motive to offer evidence which is less than truthful to cover her tracks.

. . . .

TC: Ma'am, there has been no evidence of any kind of thefts, no evidence of anyone getting busted. The money order is not in evidence right now. There is absolutely no reason to order a handwriting exemplar at this time. It's pre-mature [sic].

MJ: Well, the difficulty I'm having at this point is why it is if a person feels that they are being falsely accused of stealing, why they would turn around and accuse the

person they have been accused of stealing from of committing adultery. It would seem like then her position at this point should be I'm not going to tell anything that happened to this guy—I'm not going to tell anything that happened between us. I mean, it seems to me her motive would be the opposite, to protect herself from the allegations.

DC: Can I—can I address this, ma'am?

MJ: You may.

DC: Ma'am, the issue is there is a theft of a larger amount of money. She at this—at one point paid back some of it. It shows her guilt of that theft. I mean, it goes towards that. That's what these money orders go towards. There is still the issue out there that she owes them a bunch more money, the Christians.

Record at 487–88. After further discussion and recross examination, defense counsel ended with this exchange:

Q: Isn't it true, [RW], that you stole $5,100 from Gunnery Sergeant Christian's bank account and you paid $3,600 back?

A: Again I'm going to exercise my Fifth Amendment right.

*Id.* at 497. The defense counsel then made an oral motion to strike all of RW's testimony pursuant to MILITARY RULE OF EVIDENCE 301(f)(2), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2000 ed.). The military judge denied the motion, reasoning that:

[T]he witness testified fully to many many cross-examination questions; and after her of [sic] first invocation, she continued to answer questions on other subject area[s]. The only questions that she refused to answer were: Did you steal money, did you have access to City Bank credit card, and to identifying the handwriting on Defense Exhibit B as her own handwriting. I find that these are collateral matters that might go to her credibility; however, many other issues going to her credibility were fairly raised and flushed out, inconsistencies in her testimony and inconsistencies between her in-court testimony and her previous statements that she's made. All of those were fully developed. So therefore, I find that her invocation of her Fifth Amendment right does not go to the core of the defense.

Record at 499.

MIL. R. EVID. 301(f)(2) states:

If a witness asserts the privilege against self-incrimination on cross-examination, the military judge, upon motion, may strike the direct testimony of the witness in whole or in part, unless the matters to which the witness refuses to testify are purely collateral.

The Drafter's Analysis of the rule states, in part:

Where the assertion shields only "collateral" matters—*i.e.*, evidence of minimal importance (usually dealing with a rather distant fact solicited for impeachment purposes)—it is not appropriate to strike direct testimony. A matter is collateral when sheltering it would create little danger of prejudice to the accused. Where the privilege reaches the core of the direct testimony or prevents a full inquiry into the credibility of the witness, however, striking of the direct testimony would appear mandated.

. . . .

Depending upon the circumstances of the case, a refusal to strike the testimony of a Government witness who refuses to answer defense questions calculated to impeach the credibility of the witness may constitute prejudicial limitation of the accused's right to cross-examine the witness.

MANUAL FOR COURTS-MARTIAL, UNITED STATES (2000 ed.), App. 22, at A22–6.

In a noted text, the authors provide the following helpful commentary:

Section (2) indicates that if a witness asserts the privilege against self-incrimination on cross-examination and refuses to answer questions relating to matters testified to on direct examination, the testimony of the witness may be stricken in whole or in part. The only exception is where the matters to which the witness refuses to testify are collateral to the main issues at trial. If the witness is either a defense or prosecution witness, the judge has the discretion to strike all, or part of, the witness' direct testimony. In making that decision,

the judge should consider whether the refusal to answer questions goes to an issue which lies at the *core of the case* or touches on a collateral issue.

STEPHEN A. SALTZBURG, ET AL., MILITARY RULES OF EVIDENCE MANUAL 301.02[10] (5th ed.2003)(emphasis added)(footnotes omitted).

█ We review trial rulings limiting cross-examination for abuse of discretion. *United States v. Shaffer*, 46 M.J. 94, 98 (C.A.A.F.1997)(citing *United States v. Buenaventura*, 45 M.J. 72, 79 (C.A.A.F.1996)). Because the alleged error by the military judge affects the appellant's Sixth Amendment right to confront and cross-examine the witnesses against him, if we conclude that the military judge abused her discretion, we will reverse unless the "error was harmless beyond a reasonable doubt." *United States v. Bahr*, 33 M.J. 228, 231 (C.M.A.1991)(citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

█ We are not convinced that the military judge erred in denying the motion to strike. The defense counsel's proffered theory of impeachment was confusing, illogical and arguably not relevant. Moreover, under MIL. R. EVID. 608(b), the military judge may reasonably have viewed the alleged theft from the Christians as a collateral matter. Also, we are unpersuaded that MIL. R. EVID. 608(c) supports the appellant's assignment of error. Finally, " '[s]triking the entire testimony (,however,) is a drastic remedy and is not to be lightly done.' " *United States v. Longstreath*, 42 M.J. 806, 817 (N.M.Ct.Crim.App.1995)(quoting *United States v. Curry*, 993 F.2d 43, 45 (4th Cir. 1993)), *aff'd*, 45 M.J. 366 (C.A.A.F 1996).

Assuming, without deciding, that the military judge abused her discretion in refusing to strike RW's testimony, we conclude that the error was harmless beyond a reasonable doubt. First, the defense successfully elicited testimony from Mrs. Christian and admitted documentary evidence that established RW's culpability in the theft. Indeed, in its argument on the merits, the Government conceded that she took the money. Record at 838. Thus, the defense was not frustrated in its efforts to put that evidence in front of the military judge and argue for its tendency

to impeach RW. Second, this is not a case where a key prosecution witness refuses to answer most, if not all, questions in cross-examination. Rather, RW answered the vast majority of the defense questions in testimony that consumes well over 25 pages of the record. Third, this is a bench trial where the military judge had ample opportunity to assess RW's demeanor and general credibility on the witness stand. Fourth, the Government's evidence in support of the charges of which RW testified is strong. This assignment of error lacks merit.

### Unreasonable Multiplication of Charges

The appellant also asserts that Specifications 4 and 5 of Charge IV (indecent language) and Specifications 7 and 9–13 of the same charge (indecent assault later reduced to assault consummated by a battery) are unreasonably multiplied with Specifications 3–5 of Charge I (violation of lawful general order/sexual harassment). The appellant requests that we dismiss either the sexual harassment specifications or the indecent language/assault consummated by a battery specifications. We agree with the assignment of error and will grant relief in our decretal paragraph.

█ We consider various factors to resolve claims of unreasonable multiplication of charges (UMC), including the following: (1) Did the appellant object at trial; (2) Is each specification aimed at distinctly separate criminal acts; (3) Does the number of specifications misrepresent or exaggerate the appellant's criminality; (4) Does the number of specifications unreasonably increase the appellant's punitive exposure; and (5) Is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges? *United States v. Quiroz*, 55 M.J. 334, 338–39 (C.A.A.F.2002), *on remand*, 57 M.J. 583 (N.M.Ct.Crim.App.2002)(en banc), *aff'd*, 58 M.J. 183 (C.A.A.F.2003)(summary disposition).

█ Applying the above-noted criteria, contrary to a statement in the appellant's brief, the appellant did not raise this specific issue at trial. However, the failure to raise the issue at trial is not dispositive.

In applying the second and third factors, we note that the gist of the offense of sexual harassment is often defined as inappropriate language and physical contact. While such language and contact may not always constitute the offenses of indecent language, indecent assault, or the lesser included offense of assault consummated by a battery, that is precisely the situation in this case. While one might argue that the Government's interests in compliance with lawful general orders and sexual harassment policy are distinct from the assault and indecent language, we note that until the convening authority acted, the appellant's convictions for indecent assault and indecent language included the element of prejudice to good order and discipline. It follows that the indecent language and assaults were more than just the means by which the sexual harassment was committed; they defined the sexual harassment in this particular case.

We do not view the fourth and fifth factors as falling in favor of the appellant, but we cannot ignore the fact that his criminal record now includes unnecessary references to violations of a lawful general order. The prejudice inherent in such unnecessary convictions of record cannot be discounted. *See United States v. Savage*, 50 M.J. 244, 245 (C.A.A.F.1999). Accordingly, we will dismiss Specifications 3–5 of Charge I and reassess the sentence.

### Conclusion

In accordance with our discussion of UMC, the findings of guilty of Specifications 3–5 of Charge I are set aside. Those specifications are dismissed.

Although not raised as an assignment of error, we note that the evidence of record is insufficient as to some of the indecent language alleged in Specification 3 of Charge IV. In his argument on findings, the trial counsel conceded that no evidence had been admitted to show that the appellant said to Mrs. G: "Great body," and "Show me your tits." Record at 840. Moreover, we find no evidence of record that the appellant said to Mrs. G: "Bend over more." Accordingly, we except and dismiss the foregoing language from that specification. As modified above, the findings are affirmed.

We have considered the remaining assignments of error and find them lacking in merit. We have reassessed the sentence in accordance with the principles set forth in *United States v. Cook*, 48 M.J. 434, 438 (C.A.A.F.1998). Upon reassessment, we conclude that the sentence as adjudged and approved is appropriate and no greater than would have been adjudged but for the errors noted. Accordingly, the sentence is affirmed.

Chief Judge DORMAN and Senior Judge CARVER concur.